I think that's how the company is pronounced. We'll see. All right, I see Ms. Lamert and And I see Ms. Jones. All right. Can you both hear me? Yes, Your Honor. All right, then you may proceed. Yes, Your Honor. May it please the court. My name is Lucinda and I represent Linda Brooks, the plaintiff, the appellant in this case. This is a case of retaliation and age and disability animus. And the issue is whether my client produced evidence from which a rational fact finder could infer that Avancez's reasons for the adverse actions taken against her are truthful or true. Now, I understand the court knows the law, so I won't try to cite the law. But what I would like to do, if it pleases the court, is to address the prima facie elements of retaliation, employer liability, and discrimination. You may proceed. Yes. The Avancez contends that my client failed to establish the casual link in retaliation in the temporal proximity. And briefly, I'd like to say regarding that claim is that but for the fact that my client made her numerous complaints, the write-ups against her, namely that she threatened three employees and that she violated a proofing error, would not have happened if she had not complained. So that but for element has been met, that's been established through the circumstantial evidence that shows pretext. Also, with regards to the temporal proximity, there is no strict post-remote time. Malin v. Hospira, for example, was a case where the activity and the complaint and the adverse actions occurred in a time of three years. So I wanted to make those points on retaliation to show the court that we believe that the but for test has been met. All of that is required in this retaliation. The most important thing is that my client reasonably believed in good faith that she opposed a practice that violated her Title VII rights. May I proceed with the next? The next issue is the employer liability. Avanzé contends that my client did not argue that Ms. Chambers in particular had singular influence. But the point I want to make here, Your Honors, is that not only did Ms. Chambers have animus, this is what we contend, against Ms. Brooks, but also the decision-makers, namely Ms. Marburger and Mr. Piper. And so the law in Shager v. Upjohn tells us that an employer can be liable for the intentional torts of its employee committed in the furtherance of that employment. So what we're contending is that although Ms. Marburger and Mr. Piper alone establishes the employer liability, we contend that Ms. Chambers also brought liability upon the employer just singularly herself. Ms. Jones, I'm sorry to interrupt you. Can I ask you a question about that? I thought after the training incident with Ms. Chambers that the record shows that one of the supervisors, a fellow named Keith Redd, stepped in and directed that the plaintiff receive full training. He did. But my client contends that she never, she had to continue, the record shows that she had to continue to ask for training, even though Mr. Redd, he did, Your Honor, step in. She still had to continue to ask for training. Even in his testimony, he stated that she always asked for training. So what's the, and she always asked for it, and in the end, she received it, correct? He did receive a great amount of training. Yes, she did, Your Honor. Okay, so what's the adverse employment consequence from the alleged delay in the training? Well, with regards to this, I'm coming from the perspective of the ADEA, the age, yes, the training. There really is no, I guess there really is no, there is an end, I guess you could say, to the training. This was, I'm sorry. But she wasn't terminated for not, for not complying with training opportunities, right? No, she was not. Right. That's right, I just have a hard time with figuring out how the, how the Chambers incident, even taking it as you describe it, how that could possibly lead to liability in light of the acknowledgement that she eventually received training, and nothing in the record suggests that training had anything to do with the termination. Because she influenced Ms. Marburger and Mr. Piper, particularly Ms. Warburger, to terminate. Ms. Marburger stated that she was responsible, she recommended the termination of Ms., of my client. And the purpose of this particular discussion is to show that she, I'm actually twofold, I'm answering Avancé's or responding to Avancé's position that we never suggested that Ms. Chambers had singular influence. But what is most important here, and this is the point, that she influenced Ms. Marburger to terminate. She had some influence, it may not have been the sole influence, but she had some influence in Ms. Marburger recommending Ms. Chambers' termination. Does that help, Your Honor? Yeah, I understand what you're saying. That sounds a lot like kind of a cat's paw theory. I don't remember you briefing it that way. Well, the cat's paw theory, our position, doesn't really apply directly because it refers to a the record shows that our contention is that Ms. Marburger did have animus. So from that perspective, the cat's paw theory is not applicable. Now, after the Supreme Court ruled over the federal court, it took a position that the bias supervises input as a factor as long as the bias supervises input is a factor, it does not have to be the sole factor. But if it's part of the factor from the record, it appears from Ms. Marburger's, our position is that she had animus against my client, that Ms. Chambers' influence was part of the reason why she recommended my client's termination. Now, that doesn't relieve her of liability, or let me put it this way, we're not saying that that relieves her of any animus because we still maintain that she held animus against my client. Evidence of Kathleen Marburger's animus. I'm sorry? What evidence is there of Kathleen Marburger's animus based on age or? Well, the first piece of evidence we have here is where Mr. Marburger, who, I'm sorry, not Mr. Marburger, Mr. McGuire, who was this supervisor, the night supervisor on the third ship, he specifically went to her and Mr. Piper and informed them that Ms. Chambers had something against Ms., my client, as she and two other individuals, Ms. Goodwin and Crawford, his language was anytime they can get at her, they will get at her. He asked them to write her up. Ms. Marburger never wrote her up. She failed to discipline, there were two co-workers who cursed at Ms. Brooks and when Ms. Brooks was in, she was the lead for that day and they would not follow her instructions and they cursed at her. She rejected Mr. McKibbin's testimony that my client did not threaten him. At the meeting and during the deposition, he was clear that he informed them that my client did not threaten him. And there are other examples of Ms., I'm sorry, there's so many players here, Ms. Marburger's animus. I am going to have to stop you there though, Ms. Jones, your time has expired. It has expired? It has expired, yes. Oh, I'm sorry. Okay, thank you, Your Honor. We'll move to Ms. Leverett. Thank you, Your Honor. And may it please the court, I am here representing Avancé in this matter. And just to respond to the oral argument of opposing counsel, the but-for in this case was not because of Ms. Brooks's complaints, it was because of Ms. Brooks's conduct, okay? That's what caused the disciplinary actions that were taken, the adverse employment actions that were taken against her. As the judges noted in the other oral argument, the training really wasn't an adverse employment action. She admits that immediately following the statement of and overruled Ms. Chambers, and she got the training. So the adverse employment actions amount to her write-up and her termination for making threats and her three-day suspension without pay for bypassing quality procedures. And the court's job today is not to, go ahead. Sorry, well, is it true that the quality control issue did not come up until discovery and was not asserted in the original termination agreement or documents, I should say? Your Honor, the quality write-up, the three-day suspension was issued to her in March of 2019. It is not cited in her termination document per se, although in a union environment such as this, prior to the termination document being issued, management, upper-level HR management, did review this employee's work record and looked at the fact that she had received a three-day suspension for quality issues as part of its decision to ultimately terminate Ms. Brooks. That's not pretext. That's not evidence of pretext. It's evidence of prudence, particularly as in here where you have a union environment and you have a just cause protection level standard for the employee in this case, Ms. Brooks. So what management relied on was, you know, the issue for this court is, did management genuinely believe that threatening statements had been made at the February and the May meetings? And in this case, we have managers who sat in those rooms, in those front office meetings and heard her say words, Ms. Brooks say words, and the question isn't what were those words and were they a threat? The issue for the court is, did management genuinely believe that threats had been uttered and what management heard in those meetings immediately made those managers, two different HR managers, look Ms. Brooks straight in the eye in those meetings and say, that was a threat and you're going to get a write-up for that. You're going to get discipline for that. And then they followed up shortly thereafter with written discipline saying it was a threat. And so the question for the court is, was there a genuine belief? And that is the concrete evidence that management genuinely believed that a threat had been uttered in their presence and they took action based on that conduct. Okay. And you know, that's what the trial court construed as the bridge abutment, you know, in this case that the other side just simply cannot get around. The other thing I would note in this case, your honors, is that this is not like the Hitchcock case or the Gates-Rubber case or the Gates v. Board of Education case where decision makers, supervisory level employees had made statements derogatory about a protected status or protected conduct. We don't even have that in this case. We don't have Marburger or Piper or McGuire say anything to the plaintiff about, or Ms. Brooks, about her age or her disability or, you know, all we have is managers telling her that was a threat and you could be terminated for that. And then you're going to get a write-up for it and then turning around and doing that. The other thing I would say on the hostile environment claim that they have not established a cat's claw theory. They didn't plead it below or argue it below. And it's waived. But there isn't any showing that Chambers had any singular influence. And I would note for the record that Marburger stated she recommended the termination of Brooks solely on the basis of the statement she observed uttered in that meeting in May. And she testified to that and it's at the top of page nine of our red brief, the citation to the record on that. She did not base it on Ms. Chambers' complaint, you know, and yes, management received complaints from Chambers and others about Ms. Brooks and Brooks issued complaints about her coworkers. But all of those complaints involved personality disputes. Other than the October 2018 claim that Chambers said they said she was too old, the other written complaints she submitted all involved, you know, not, you know, age-based comments. And the disability hostile environment claim is even weaker because there's not even any admission that she ever talked to her coworkers about any disability or disability status. The final point I'd like to make in my response is that I think the trial court did not abuse its discretion and was completely appropriate in not allowing the state law intentional infliction of emotional distress claim in this case. The opponents would like to use Illinois law and Illinois standards for an Indiana case. That's clearly not something the court, the trial court in Indiana needed to do. The cases they cite, the Honaker case in Pavelon are very different in terms of the facts being basically took action to enforce their work rules to try and have a safe work environment. And that's the action that they took. The three-day suspension was done as after watching the video, seeing this employee take actions to bypass the quality procedures. It had nothing whatsoever to do with any claims of age issues or disability or any complaints. I, you know, in terms of the regarded as claim, I would say that there is no evidence of that. And even so the ADA doesn't require employers to rescind or not issue discipline. If the conduct in question violates their work rules, even if the conduct caused by or exacerbated by a disabling condition, and it would say to the Guzman case on that, and I'm free to take questions. It appears that we don't have any more questions for you, Ms. Lamert. So thank you. We'll return to Ms. Jones. Ms. Jones, your time had expired, but if you have something to say to wrap up your argument and you haven't. Yes, I do, Your Honor. Quickly, the bypassing error was, right up was made in May. They did not claim it as the reason for her termination of part of the reason for termination until October, 2020. This is the kind of circumstantial evidence, pretext evidence that lines this case, you know, deviation from standard procedures where they punished my client for conduct issues, whereas they didn't punish other employees. Suspicious timing, just a number of things that we laid out in the brief that suggests that it was pretext. My client, prior to the complaint she made in February to Mr. Piper, she was never written up. Even Avanze admitted that she was a great employee. So for Avanze to contend now that particularly the bypass error was later brought up, or was earlier brought up, nor was not. So this case relies heavily on retaliation. They retaliated it against her because she complained about age and disability discrimination. All right, I think that's really the nutshell of it. Thank you. Thanks to both counsel in the case. We'll take the case under advisement and move to our